[Nos. 10281-5-III; 10623-3-III.    Division Three.    April 23, 1992.]

MACHEN, INC., ET AL, *Appellants*, v. AIRCRAFT DESIGN, INC., ET AL, *Respondents*.

320

*James A. Perkins* and *Bogle & Gates,* for appellants.

*Laurel H. Siddoway, Peter J. Grabicki,* and *Randall & Danskin, P.S.,* for respondents.

THOMPSON, J. — Machen, Inc., and American Aviation, Inc., appeal (a) the summary judgment dismissal of their trade secret and contract claims, (b) the jury verdict and judgment awarding damages to Aircraft Design, Inc., on its defamation and commercial disparagement counterclaims, and (c) the denial of their motion for judgment notwithstanding verdict. We reverse the award of damages to Aircraft Design on its defamation and commercial disparagement counterclaims, but affirm in all other respects.

Machen, Inc., and American Aviation, Inc., develop and manufacture new airplane parts on an aftermarket basis. On August 1, 1984, Machen, Inc., hired Darwin Conrad as a salesman. At that time, Machen was owned by Steven Speer, Jim Christy, and Hugh Evans. Conrad became Machen's research and development coordinator in May 1985. In July, Evans left Machen and his stock was acquired by Speer and Christy, who then formed American Aviation, Inc. From January 1, 1986, until May 1988, Conrad was American's research and development coordinator.

In May 1988, Conrad and Gary Dilley, an American customer, formed a corporation called Aircraft Design. Shortly after its formation, Aircraft Design became the exclusive distributor of a modified Beechcraft Duke brake for use on

the Piper Aerostar. The brake was manufactured by Cleveland Brake, a major manufacturer of brakes for private aircraft.

American commenced an action against Conrad and Aircraft Design, alleging misappropriation of trade secrets in connection with the modified Beechcraft Duke brake and breach of employee loyalty by Conrad. Conrad counterclaimed for slander. Aircraft Design responded with its own counterclaim for costs and fees based on CR 11, bad faith, and frivolous claims.

After the lawsuit was commenced, an article written by Christy was published in the trade publication Aerostar Log. Christy wrote that, based on his testing of the replacement brake marketed by Aircraft Design, he could "see no difference between the [replacement brakes] . . . and the original equipment" and he "found no advantage in changing" to the replacement brakes. Christy, 18 Aerostar Log 32 (No. 3, Spring 1989).

Conrad then contacted Ron Freeman of Aerostar Transport Corporation and hired him to "do an independent evaluation of the new style vs the old style brakes". Freeman conducted an evaluation as requested and prepared a written report entitled "The Brakes That Do Stop".

Aircraft Design amended its answer to add a counterclaim for what was later interpreted to include a claim for defamation and commercial disparagement based on statements made in Christy's Aerostar Log article. Machen thereupon joined American's lawsuit as plaintiff, added Dilley as defendant, and amended the complaint to add another claim for misappropriation of trade secrets by all defendants in connection with a Mooney 201 engine modification project and a claim for breach of common law and contractual duties of confidentiality by Conrad.[1] Aircraft Design and Dilley responded with an antitrust counterclaim against Machen.

---

[1]Hereinafter, Machen, Inc., and American Aviation, Inc., will be referred to collectively as Machen, unless the context requires otherwise.

Aircraft Design and Conrad moved for summary judgment dismissal of the trade secret claims. The motion was granted as to the replacement brake. As to the engine project, the trial court determined as a matter of law the following was not a protectable trade secret:

any method or technique of researching aircraft components manufactured or used by other aircraft product manufacturers, and identifying one or several models closely approximating the final design configuration of a proposed modification project so as to use those models as a "basis of certification" . . ..[2]

Conrad moved for summary judgment dismissal of Machen's claim for breach of a written confidentiality and ownership of invention agreement. He denied signing the agreement and argued even if he had signed it, it was not supported by consideration. Further, Conrad argued the agreement was invalid because it failed to disclose employee rights regarding inventions as required by statute. The trial court determined the agreement lacked consideration and was invalid and unenforceable. Machen's claim was dismissed with prejudice.

On September 28, 1989, Machen filed a notice of discretionary review of the dismissal of its misappropriation of trade secret claims (Court of Appeals cause 10281-5-III).

Prior to trial on the remaining claims and counterclaims,[3] Conrad filed a motion in limine to preclude reference to the employee agreement Conrad allegedly signed. The motion was granted. Trial commenced on November 27, 1989. On December 14, before instructing the jury, the trial court ruled Christy's statements in the Aerostar Log, as "fair comment" on a marketable product, enjoyed a qualified privilege. The jury found in favor of defendants on all claims and counterclaims and awarded damages on the counterclaims in the amount of $81,283.

On January 29, 1990, the trial court entered an order of finality as to the claims disposed of by court order or jury

---

[2]"Certification" refers to certification by the Federal Aviation Administration.

[3]The antitrust counterclaim and attorney fees claim were severed for separate trial and are not at issue in this appeal.

verdict. A notice of appeal was filed by Machen on February 28, 1990 (Court of Appeals cause 10623-3-III). All claims at issue were determined to be appealable as of right, and Court of Appeals cause 10281-5-III and cause 10623-3-III were consolidated.

### TRADE SECRET CLAIM

Machen assigns error to the summary judgment dismissal of its claim for misappropriation of brake project information. The information which Machen sought to protect as a trade secret consisted of (a) the knowledge that the original Piper Aerostar brakes were deficient, (b) a modified replacement brake would be a marketable product, (c) the Beechcraft Duke brake was a suitable candidate for modification, (d) the strategy to use Cleveland Brake's existing technical expertise to obtain Federal Aviation Administration (FAA) certification, and (e) the marketing strategy and business plan to obtain exclusive distribution rights from Cleveland Brake.

The trial court held as a matter of law the brake project ideas and technology were not protectable trade secrets under RCW 19.108.010(4) and, even if they were, the authorized disclosures to Cleveland Brake without any attempts at maintaining confidentiality negated trade secret protection.

Once a common law concept, trade secret protection is now governed by statutes in most states, including Washington.[4] A trade secret is:

> (4) . . . information, including a formula, pattern, compilation, program, device, method, technique, or process that:
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

---

[4]In 1981, Washington adopted the Uniform Trade Secrets Act, with revisions, and codified it at RCW 19.108.010-.940. The Uniform Trade Secrets Act was approved by the National Conference of Commissioners on Uniform State Laws in 1979 and was amended in 1985. Thirty-five states plus the District of Columbia have adopted the Uniform Trade Secrets Act. "Table Showing Jurisdictions Wherein the Act Has Been Adopted", RCWA 19.108 (Supp. 1992); 14 U.L.A. 71 (Supp. 1992).

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

RCW 19.108.010(4). A plaintiff seeking damages for misappropriation of a trade secret has the burden of proving that legally protectable secrets exist. *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 49, 738 P.2d 665 (1987).

■ As moving parties, Aircraft Design and Conrad had the burden of showing there was no evidence to support Machen's trade secret claim. *Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 624, 818 P.2d 1056 (1991). If this burden was met, Machen had to present evidence sufficient to establish the existence of each essential element of its case in order to avoid summary judgment. *Howell*, at 625.[5]

■ In support of their summary judgment motion, Aircraft Design and Conrad submitted evidence to support the following contentions: (a) no trade secrets existed because Conrad independently conceived the information before his employment at Machen; (b) the information was generally known, readily ascertainable, and had no independent economic value; and (c) reasonable efforts had not been taken to maintain the secrecy of the information. We evaluate the evidence submitted in a light most favorable to Machen. *Hartley v. State*, 103 Wn.2d 768, 774, 698 P.2d 77 (1985).

Knowledge that the original Piper Aerostar brakes were deficient lacks the requisite novelty of a trade secret. This information was generally known or readily ascertainable by Piper Aerostar pilots, mechanics, and airplane parts manufacturers. It was information known by Conrad prior to his employment by Machen.[6]

---

[5]As set forth in *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 770 P.2d 182 (1989), if plaintiffs do not make this showing: " '. . . [T]here can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.' " *Young*, at 225 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986), *cited and quoted with approval in Howell*, at 625).

[6]Conrad provided affidavit and deposition testimony that he conceived the idea of an improved brake for the Piper Aerostar while an employee of another

Using the Beechcraft Duke brake as the subject for modification was also information readily ascertainable. The undisputed facts at the time of summary judgment established that the only part of the Beechcraft Duke brake which required modification was the torque plate which attaches the brake to the axles, and even then only the holes on the torque plate had to be repositioned. To be a trade secret, information must not be readily ascertainable by proper means from another source, including the product itself. RCW 19.108.010(4)(a); *Boeing*, at 49-50.

Regarding economic value of the information, Jim Christy stated in his deposition the replacement brake sold by Aircraft Design did not work and would have given Machen a "bad name" if it had marketed the product. Machen refutes the importance of this testimony by arguing it would not have sued for misappropriation nor would Aircraft Design have bothered with an exclusive distributorship arrangement if the information had no value. We find the argument unpersuasive. Machen failed to present evidence which would establish that the information derived "independent economic value, actual or potential", even if the information were not generally known or readily ascertainable. RCW 19.108.010(4)(a).

As to the marketing strategy and use of Cleveland Brake's technical expertise, the evidence established that such information was readily ascertainable, if not generally known in the industry. This brings us to Machen's final contention that even if portions of the information were generally known or readily ascertainable, the "whole concept" is protectable as a trade secret.

---

aircraft product company, Turbo Plus, and he spoke with others about it. His averment was supported by the affidavits of former coemployee Larry Shapiro, and by acquaintance Ray Rogers. To refute this evidence, Machen submitted the affidavit of a Turbo Plus employee in research and development. This employee said he had not heard any discussions or mention of the need for an improved brake for the Aerostar even though he "was consulted about every idea that . . . anyone . . . considered". This statement is not sufficient to raise a genuine issue of fact, even if the information were novel enough to constitute a trade secret.

■ Trade secrets often include elements which by themselves may be in the public domain, but when taken together qualify for protection. *Boeing*, at 50. *See also Integrated Cash Mgt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171 (2d Cir. 1990) (not interpreting Uniform Trade Secrets Act); *Syntex Ophthalmics, Inc. v. Novicky*, 591 F. Supp. 28 (N.D. Ill. 1983) (not interpreting Uniform Trade Secrets Act), *aff'd in part*, 745 F.2d 1423 (Fed. Cir. 1984), *vacated on other grounds*, 470 U.S. 1047, 84 L. Ed. 2d 807, 105 S. Ct. 1740 (1985); *see generally* Annot., *What Is "Trade Secret" so as To Render Actionable Under State Law its Use or Disclosure by Former Employee*, 59 A.L.R.4th 641 § 3, at 665 (1988).

■ Considering all the separate elements together as one concept, the combination of ideas which Machen attempts to protect lacks novelty and uniqueness. Furthermore, contrary to RCW 19.108.010(4)(b), the "whole concept" was disclosed to a third party without any attempts to ensure confidentiality. The requirement for secrecy is not absolute. However, as set forth in Unif. Trade Secrets Act § 1 comment, 14 U.L.A. 439 (1990), reasonable efforts must be taken to maintain secrecy.

> [R]easonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on "need to know basis", and controlling plant access. On the other hand, public disclosure *of information through* display, trade journal publications, advertising, or other *carelessness* can preclude protection.
> *The efforts required to maintain secrecy are those "reasonable under the circumstances."* The courts do not require that extreme and unduly expensive procedures be taken to protect trade secrets against flagrant industrial espionage. It follows that reasonable use of a trade secret including controlled disclosure to employees and licensees is consistent with the requirement of relative secrecy.

(Citation omitted. Italics ours.)

Machen points to protective measures taken at its manufacturing facility. Those general measures, however, were not designed to protect the disclosure of information by a Machen principal at a trade show.

Machen also contends the disclosure to Cleveland Brake at the trade show did not destroy the trade secret status of the information because there was an implied-in-fact contract obligating Cleveland Brake to maintain the confidentiality of the information disclosed. Machen cites *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986), *Prudential Oil Corp. v. Phillips Petroleum Co.*, 418 F. Supp. 258 (S.D.N.Y. 1976), and *Burten v. Milton Bradley Co.*, 763 F.2d 461, 463 (1st Cir. 1985). Despite having its own "aftermarket", Machen asserts that Cleveland Brake does not steal a competitor's product concept; it jointly develops the product and customarily grants competing inventors an exclusive distributorship to sell it. Further, the Machen principal understood the information he revealed would be kept secret as a "matter of industry custom".

In his deposition, Jim Christy testified as to "industry custom". He stated there was no written confidentiality agreement with Cleveland Brake "because it is implicitly understood by general aviation supplier[s] and purchasers that such discussions are confidential . . . [and it is a] widespread and longstanding industry custom and practice within the general aviation industry." Christy's statements regarding industry custom were supported by two affidavits from industry representatives. The trial court refused to consider the two affidavits because, irrespective of industry custom, Cleveland Brake itself did not consider the information confidential.

■ We agree with the trial court. Machen failed to present any evidence which indicated Cleveland Brake considered the information given it by Christy to be confidential.[7] There was no evidence that Machen brought the confidentiality issue to Cleveland Brake's attention. Aircraft Design, on the other hand, presented deposition testimony by an employee of Parker Hannifin (parent company of Cleveland Brake) that, absent agreement, information received would *not* be

---

[7]We also note that Cleveland Brake was not named a defendant in this lawsuit.

considered confidential. The trial court concluded Christy had a "subjective view" that Cleveland Brake would treat the information confidentially, but took no steps himself to see that the information would be protected. Gratuitous, unsolicited disclosure of information does not impose upon a recipient a contractual or fiduciary obligation not to disclose it. *See, e.g., Irizarry y Puente v. President & Fellows of Harvard College*, 248 F.2d 799, 802 (1st Cir. 1957), *cert. denied*, 356 U.S. 947 (1958). As set forth in *Pacific Title, Inc. v. Pioneer Nat'l Title Ins. Co.*, 33 Wn. App. 874, 879, 658 P.2d 684, 38 A.L.R.4th 961, *review denied*, 99 Wn.2d 1020 (1983):

> The originator of information cannot claim a property right in it as against one to whom he has disclosed it without bringing to the latter's attention his expectation that the information will be held in confidence and not used in competition.

Here, there was no evidence to show any confidential relationship between Cleveland Brake and Machen. The law of trade secrets does not protect information disclosed without establishing a basis for its confidentiality. *Boeing*, at 49. *See generally* Annot., *Disclosure of Trade Secret as Abandonment of Secrecy*, 92 A.L.R.3d 138 (1979).

We affirm the summary judgment dismissing Machen's trade secret claim.

BREACH OF CONFIDENTIALITY CLAIM

Machen next assigns error to the summary judgment dismissal of its claim against Conrad for breach of a written confidentiality agreement. Machen contends we must accept as true that (a) Conrad signed the agreement, (b) signing it was a condition of continuing employment, and (c) Conrad received additional training and access to new project information after and because the agreement was signed. The only issues, Machen asserts, are whether there was adequate consideration as a matter of law and whether the agreement was void under RCW 49.44.140(3).

Conrad denies signing a confidentiality agreement, but argues even if he did sign the agreement, it would have been almost 2 years after he was hired by Machen and 4

months after his transfer to American. He denies receiving access to allegedly confidential matters after the alleged signing and asserts any agreement regarding confidentiality was with American, not Machen. Machen contends Conrad's continued employment and training by American constituted sufficient consideration to support the agreement. *Wood v. May*, 73 Wn.2d 307, 438 P.2d 587 (1968); *Knight, Vale & Gregory v. McDaniel*, 37 Wn. App. 366, 680 P.2d 448, *review denied*, 101 Wn.2d 1025 (1984).

Although the parties use the terms "sufficiency" of consideration and "adequacy" of consideration interchangeably, they are not synonymous. "Sufficiency" is not concerned with the comparative values of the promises exchanged. It relates only to whether *something* exists which will support a promise. "Adequacy" relates to the comparative values of the promises exchanged and is rarely the subject of judicial inquiry. *Browning v. Johnson*, 70 Wn.2d 145, 422 P.2d 314, 430 P.2d 591 (1967). At issue here is the "sufficiency" of the consideration, not its "adequacy". *But see Wood v. May, supra.*

In *Knight*, two employees signed a noncompetition agreement on their first day of work. In response to the employees' contention the agreement lacked consideration, the court held that continued employment and training are sufficient consideration for an employee's promise not to compete. *Knight*, at 368-69.

*Knight* relied on *Wood v. May, supra*, and *Racine v. Bender*, 141 Wash. 606, 252 P. 115 (1927). In *Wood*, a "master horseshoer" hired an apprentice who, after 2 years, became a proficient horseshoer. The two had entered into a noncompetition agreement. The employee left his employment to set up his own horseshoeing business within the proscribed area. The employer sued. *Wood* held the agreement was supported by "adequate [*sic*]" consideration because the employer taught the employee the skill of horseshoeing in return for a promise not to compete.

In *Racine*, a CPA employee did not sign a noncompetition agreement at any time during his 5-year employment. How-

ever, at the end of each week the CPA was required to prepare and sign a report showing the clients' accounts on which he worked. In the report, above the employee's signature line, was a section entitled "warranty" which contained language to the effect the CPA was not to perform accounting work for any of the clients he serviced for 3 years after his employment, nor was he to disturb his employer's relationship with those clients. *Racine*, at 609, held the "warranty" on each report "was . . . a basis and a part consideration for future employment" and formed part of the enforceable employment contract.

Conrad contends that his continued employment, standing alone, was insufficient consideration for any "posthire" contract. He relies on *Schneller v. Hayes*, 176 Wash. 115, 28 P.2d 273 (1934), and argues that *Knight, Racine*, and *Schneller* constitute a "split of authority" on the issue.

In *Schneller*, an optician living in Montana orally agreed to work for an optometrist in Washington. It was disputed whether a noncompetition agreement was discussed before the optician resigned his former job. Shortly after commencing work in Washington, the optician was asked to sign a noncompetition agreement. At first he refused, but he signed the agreement on August 24, 1932. After his compensation was reduced over a period of 6 months, he quit and set up a competing optical business. His employer sued for breach of the noncompetition agreement. *Schneller*, at 118-19, held the agreement lacked consideration because it did not promise future employment and stipulated nothing as to wages. Although we note the agreement did not disclose what instruction the employee received or what experience he acquired during employment, *Schneller* did not hold that a promise of future employment standing alone was insufficient consideration to support a noncompetition agreement. *Schneller*, at 120-21. We do not agree with Machen that *Knight, Racine*, and *Schneller* are in conflict.

Although cases cited by the parties involve noncompetition agreements rather than confidentiality agreements, we

see no reason to distinguish between the two when the issue is the sufficiency of consideration to support them. Nor is there a meaningful distinction between a "promise of future employment" as discussed in *Schneller* and *Racine*, "continued employment" as discussed in *Knight*, and "retaining" the employee as the agreement at issue provides. A promise of future employment, whether denoted "a promise of continued employment", or "a promise of retaining" the employee, is sufficient consideration to support a confidentiality agreement. *Knight.*

Even if the promise of future employment, standing alone, is not sufficient consideration to support a confidentiality agreement, there was substantial evidence before the trial court that Conrad received continued training and experience while employed by American. Coupled with continued employment, this training and experience was sufficient, as a matter of law, to support a confidentiality agreement. However, the evidence indicates Conrad's agreement was with American, not Machen, and the information at issue predated Conrad's transfer to American.

Conrad's next contention provides a more compelling reason to conclude the trial court was correct in finding the confidentiality and ownership of invention agreement was invalid and unenforceable. The agreement does not comply with RCW 49.44.140(3). It provides:

> If an employment agreement entered into after September 1, 1979, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work p[er]formed by the employee for the employer.

The agreement at issue purported to protect:

all ideas, inventions, and other developments or improvements conceived by Employee, alone or with others, during the term of his or her employment, whether or not during working hours, that are within the scope of American Aviation's business operations or that relate to any of American Aviation's work or projects . . ..

Here, no written notification complying with the requirements of RCW 49.44.140(3) was given to employees.

Contractual provisions which conflict with the terms of a legislative enactment are illegal and unenforceable. *Hederman v. George*, 35 Wn.2d 357, 212 P.2d 841 (1949). We do not agree with Machen's contention the nondisclosure/confidentiality provisions of the agreement can be severed from the invention provisions. Contracts are severable only when performance by each party can be divided into equivalent parts. *Mutual of Enumclaw Ins. Co. v. Cox*, 110 Wn.2d 643, 649, 757 P.2d 499 (1988). Whether a contract is severable depends largely on its terms and the intention of the parties. *Cox*, at 649. This agreement does not contain a severability clause, and by its terms, severability cannot be implied. Nor was evidence presented that severability was intended. Based on undisputed facts, the written agreement is unenforceable as a matter of law, even if supported by sufficient consideration. The court did not err in dismissing Machen's claim for breach of the confidentiality agreement.

Pursuant to RCW 2.06.040, the remaining contentions and the court's answers to those contentions, having no precedential value, will not be published.

SHIELDS, C.J., and SWEENEY, J., concur.

Review denied at 120 Wn.2d 1007 (1992).